Good morning, Your Honors. It may please the Court, Joshua Bleich for the appellant, Stuart Regis, and I'd like to reserve five minutes of my time for rebuttal. I'll keep an eye on the clock. The University of Washington encouraged faculty to put land acknowledgment statement on their syllabi, but Professor Regis doesn't believe political statements have any business in course syllabi, and he disagreed with the university's message. So to make his point, he wrote a parody of the statement and put that on his syllabi instead. When some students and staff felt offended by Professor Regis' parody, the university punished him for it, violating the First Amendment. But disagreement is not disruption. This is true particularly in the university setting, where students are adults and where engagement with ideas that you disagree with is a feature, not a bug, of higher education. If the district court's opinion is allowed to stand, faculty will censor themselves for fear that any complaint might lead to their punishment. This court should reverse and direct entry of summary judgment for plaintiff, for Appellant Stuart Regis, on all his claims. I understand Professor Regis has been, I understand Professor Regis has been, you know, making comments about the land acknowledgment in other ways, like, you know, on the door of his office and in his email signature and perhaps in media visits. And so what is the relevance of that to this case? Which way does that cut? It's not relevant to this case because right now we're focused on his speech in the syllabus. The government just, you know, the same way that it can't expel a handbiller to a far along sidewalk out of the public park, the government here cannot open up the, a syllabus for debate about a matter of public concern like the historical ownership of state land in the way that they did and then banish Professor Regis because of the viewpoint. And that's, that's the, you know, the second point, which is the problem here is not necessarily that he can put this on his door or, you know, say, say this on the sidewalk on campus. The university, his option was to either parrot the university's position on his syllabus or say nothing. Instead, he chose to say something different and he got punished for it. And I'd also like to note that it's not exactly true that he has the ability to, to use his land acknowledgment statement anywhere else on campus. Dean Albritton, the dean of the College of Engineering, noted at her deposition that Professor Regis, you know, would, you know, when asked if he could hold up a sign with his land acknowledgment statement, for example, whether or not he would be subject to punishment would depend on the nature of any complaints that the university might have gotten. So, yes, he's been allowed to, during the pendency of the litigation, include his land acknowledgment statement on his email signature or on his door. But it's not exactly true that he's free to continue doing so without punishment indefinitely. Counsel, let me ask you this. I think I heard you just a minute ago suggest that we, as the Court of Appeal, could render a decision for your client without sending this back to the trial court. But the case is just filled, from my perspective, with questions about who actually dropped out, why the student took a leave of absence and did so, why the student switched sections and so on. Isn't that the quintessential kind of thing that one would send back to the district court, the fact finder, to make a determination of what the real facts are? I don't think so, Your Honor. I don't think that we have any disputes of material fact here. The parties agree about what basically happened. The parties agree that Professor Regis included his land acknowledgment statement on the syllabus. The parties agree that a certain number of students and staff complained because they felt offended. The dispute here is what is the significance of those complaints of offense? Well, yes and no. There was one who allegedly dropped out, turned out might not have even been real. That's right, Your Honor. Another one that took a leave of absence, but nobody knows why. If the student did that because of Professor Regis and his actions, then that's important. If not, then why mention it in the first place? To me, there are open questions, material questions that go to what the impact of Professor Regis' actions were, at least from the perspective of the university. Isn't that correct? As Your Honor, as we noted in our opening brief, this is de novo review, and if the court sees it differently than the litigants did in their cross motions for summary judgment that there are disputes of material fact, certainly remanding to the district court for further development on that would be available to you. What's the current status? If I have the facts right, there is a finding of violation, but no sanctions. Is that where it stands? There are no official sanctions at the conclusion of the investigation, but that doesn't mean that there wasn't adverse action. I'm not necessarily questioning adverse action, but what's the remedy you're seeking? To revoke the letter of discipline? That would be a great place to start. I think an injunction preventing the university from enforcing. Well, that's a stretch. Prevent the university from enforcing Executive Order 31 or prevent the university from punishing Professor Regis in the future for any other complaints of offense that students might submit. But as it sits now, it's a letter of reprimand, no sanctions. Is that right? That's not right. Your Honor, in the letter, Dean Albritton noted that if they received, in their view, there was any other disruption, which as we know from the way that this case played out, any complaints means disruption to the university. So if there are further complaints, in the letter she said she would be forced to conclude that he intentionally violated Executive Order 31. So that kind of threat of future enforcement would have a chilling effect on a person of ordinary firmness. Counsel, do I misunderstand that the university also, if you will, deferred a merit pay increase as a result of this dispute? You did not misunderstand that, Your Honor. When the university subjected Professor Regis to the year-plus long investigation as part of that, unbeknownst to Professor Regis at the outset even, his merit pay increase that he would normally have been entitled to was held in abeyance. So that gets to my colleague's question to you, and isn't that something you would be looking for, or did he ultimately get that? He did receive his merit pay, but he is due interest. And I also note, would also note the, we've alleged emotional distress damages here, too. Professor Regis was held on the hook for a period of, I think, 13, 14 months, unsure if he would be suspended, if his pay would be docked, or if he would be even fired while the university was investigating his alleged violation of university policy. Never mind that the university's investigation apparently concluded with an oral report from the investigative committee to administrators in October of 2022, but the university never informed Professor Regis about the conclusion of this investigation until the summer of 2023. So for this entire period of time, he had no idea what his future at the university would be. So that, in addition to the interest that he's owed, the damages, and the threat of future enforcement from that June 12th, 2023 letter, those are all the damages, those are the remedies that we, remedying those damages. And you have, you have pled for those? I'm sorry, Your Honor, I didn't. You have, you, in your complaint, you pled to recover those in some way? We did, Your Honor. Yeah. So I always have trouble in pickering cases and assessing how much disruption or potential disruption is enough. I mean, there are some cases that say, kind of set a low threshold. Some seem to set a higher threshold. And I think it's Dodge's, there's a reasonable probability of disruption. Can you help me analytically? Tell me what, what you think the measure of disruption is under pickering? Of course, Your Honor. And I think before we get into that specifically, I think it might be important to note at the outset, the burden that's on the university when showing their interest in that disruption, which, you know, in Hernando's, I mean, I just want to know what, what, what, what how much, taking into consideration it's their burden, how much disruption is enough? I think it's their interest in efficient operations, right? So we look to whether the employee has been able to continue his or her job duties. And we look to whether the employer's mission has been burdened in any way. And here, I think the key, the key difference here between the University of Washington and many other pickering cases, many other public employee speech cases, is that we have a public university campus. And the mission of a public university campus is to engage in the kind of debate of ideas and search for truth. That that's the whole reason we have academic freedom in the United States. The university, there's no, you know, for, for 50 years, in fact. I get your argument. But I mean, in the, in the university context, how much disruption satisfies the pickering burden? I think, Your Honor, if the professor is no longer able to teach, if there's something going on, what, you know. I'm talking about the disruption to the students. I, so, are you, are you asking the Honor about that? Well, I think you understand my question. I think so. So I think the university has, you know, stated an interest in creating a welcoming environment for its students. And to the extent that the university wants to provide other resources for its students to help out or to even share its own view about, you know, in this case, Professor Regis' statement, the university is free to do so. But if it were to take action against Professor Regis or any other speaker based on the reactions of the listener, it would really just be effectuating an unconstitutional, unconstitutional heckler's veto. So, so to the extent that Professor Regis, in this case, was able to continue teaching his class, there were no walkouts. There were no major disruptions in his class. He's continued teaching throughout the pendency of this litigation. So the university's interest here, which is the efficient provision of its services, education, has not been disrupted in any way by Professor Regis' expression. Maybe part of what you're saying, which is more how I understood the briefs and gets back to some things that we've said in our cases a long time ago and kind of in Tinker, that, you know, the type of disruption that we're talking about under Pickering, when you're talking about a university professor saying something that may really rile people up is kind of not the type of disruption that can be really factored into this because the consequence of that would be that you're telling, you're essentially suppressing a viewpoint in an academic setting. That's right, Your Honor. And, you know, I think Tinker is helpful, but I would also caution that the kind of substantial disruption that Tinker talks about is not exactly, I wouldn't say is relevant to a university setting where we have students who are adults. And there's a lot more freedom for faculty and for students for freedom of expression than there is in the K-12 setting. And I think that's why the district court's reliance on cases like Downs and like Johnson was erroneous because those are K-12 cases, public employee speech cases, where it involves teachers who either put up religious banners in their classroom or hang up bulletin boards. And there's just a lot more control in that case. The government interest is a lot stronger than it is in a case like Professor Regis's where it's a public university campus. And, you know, to go back to Judge Thomas's point about the disruption needed, you know, I wanted to point to Dodge in particular, which I think is a really helpful case for this one, which is that, you know, in that case, a teacher, so again, the government interests are a little bit stronger, but a teacher wore a MAGA hat to a professional development session. And a lot of the same things that, you know, we heard in this case, we heard in that case. So some of the teacher's colleagues felt shocked. They felt upset. They felt angry, scared, frustrated, and not safe. Those are a lot of the same kinds of complaints of offense. These are the same kinds of subjective feelings that students and staff, in this case, heard. But the Ninth Circuit in Dodge, how those kinds of feelings are not the disruption. That's the normal disruption that occurs anytime there's controversial speech. And it's not the kind of disruption that can justify. There's a suggestion, maybe in the state's brief, excuse me, the university's brief, that maybe the syllabus is different because it's government speech. Do you want to address that? I do, Your Honor. I think the district court rejected that argument, and I think rightly so. First, I think we can look, you know, to the facts in this case about, you know, why this isn't government speech. The university has a syllabus guideline policy, but there's no mandate. There's no, you know, mandate about content. That's all up to the professor's discretion. So a syllabus really is just the written work product of the faculty's in-class speech. And dependents themselves acknowledge that faculty have great flexibility in crafting their syllabi. So the idea that it might be mistaken for the government's own speech, I just, I think, doesn't really play in this case. And I'd also note that... I want to follow up on the Hector Uvito concept. As I read these briefs, I was struck by what, how sensitive the students or others were. Some people would call it woke, but they call it whatever they want. But the reality is you've got people who were upset. What standard do we use in determining whether there's a Pickering issue or not? Let's say we had a room full of people who considered a triggering moment, if you will, as if the professor blew his nose or the professor wore a MAGA hat. Can that possibly count in a Pickering analysis? I don't think so, Your Honor. At least to the extent... I mean, it's something that you would consider in the sense that in a balancing test, you weigh lots of different things. But I don't think it has really any weight in a university setting. I think this court's cases make that very clear that a university setting has a... is a place for a vigorous exchange of ideas. There's no compelling interest in a sedate academic environment. So to the extent that that goes to the government's interest in punishing or limiting the professor's expression, I don't think that plays. And I see that... So if you were in a university and you had a conservative professor and everybody else was liberal and they didn't like what the conservatives said, you couldn't take that into account? Is that what you're saying? I'm saying it wouldn't be... the university would not have a compelling or sufficient interest in punishing that conservative professors. And that's the point... It goes to the interest then. That's exactly right. And that's the point of the First Amendment is to protect even unpopular speech and even in a place like a university campus or especially, I would say. But in this context, the difference is you have concerns about the native population. They're singled out. And the university is trying to recruit native students, trying to promote a welcoming environment. That's different from wearing a mega hat. That's one of the central, I guess, objects of most universities in the Northwest. I don't think it is any different, Your Honor. And yes, it has more relevance in the Northwest, but that's precisely why this is core political speech. Except that if it interferes with recruitment of indigenous and native students, then it does disrupt the mission of the university. But, Your Honor, I don't think the university can rely on speculative... No, but I mean, Dodd says reasonable predictions of disruption. That's right, Your Honor. But this is, you know, again, we're at a university where students are adults, where, again... So you say. They are adults. I was just about to say that. Usually they are adults. Obviously there are some under 18. But for the most part, this is a community of academics and people going to learn and people going to be exposed to new ideas. In Rodriguez v. Maricopa County, this court said that the First Amendment embraces a heated exchange on campus, even or perhaps especially when they concern sensitive topics like race, where the conflict and risk of insult is high. So a topic like this, where it's especially important in the Pacific Northwest, is still squarely protected. And there needs to be plenty of breathing room for faculty and everybody else on a university campus to debate and disagree on those ideas. And I see I'm eating into my five minutes. If there are no further questions, I'll reserve that. Thank you. Good morning, Your Honors. May it please the Court. David Hosp for the University Appellees. I think we should start with something we all agree with. Universities should take great care to avoid silencing their professors. And with respect to this case, the University of Washington did not silence Professor Regis. I would submit that in terms of the appellant's brief and including some of the argument today, the actual facts of this case have been given short shrift. And I think that that's because, fundamentally, the Pickering balancing is a fact-driven inquiry. So let's unpack the facts briefly just for a moment. What happened here was, beginning in the late winter of 2021, Professor Regis began using his land acknowledgment statement. He was using it on his signature block, on his emails. He was emailing it to professors. He was encouraging discussion among professors about this. The university took no action. There was no objection to the content of his speech whatsoever. Then what happened was he included it on his syllabus. And the reaction of the students was immediate. It was immediate. And Professor Regis even acknowledged this in his own diary. He acknowledged that it blew up, in a sense. And so the university took very limited action. And let's be clear about what that action was. The university removed the land acknowledgment statement from the electronic version of the 2022 winter syllabus. They also instituted an additional section of the class. And this was in response to a number of student complaints and concerns. They were concerned that Professor Regis could not be fair and impartial to them. That he potentially could react to certain categories of students differently in their class. And so, in order to fulfill the university's educational mission, the university instituted a second section. That's all the university did. And in fact, that's where we were. Now, notwithstanding the fact that the disruption, the fallout from what was included on the syllabus continued. And to be clear... But just maybe a clarification on that. It seemed that your clients would be willing to have him or would allow him to put it on a syllabus going forward? As long as it doesn't... Again, the reaction that the university took was a reaction to the disruption. It was not a reaction to the content. The reality is... And if I could just... But isn't the disruption related to the viewpoint? I mean, isn't that why there was disruption? That people did not like the view he was expressing? I think that you're right. Offense can lead to disruption. And that was what happened in this instance. But the university didn't target the content. The university took action in order to ensure that it could accomplish its educational mission. And you know that... And if the root of the disruption is the viewpoint, it doesn't... I'm not sure this distinction is that material. No, I think, in a sense, it is, Your Honor. It's a distinction that matters. And I think you can see that in how the facts played out here. Because what happened was the only action that was taken was to remove the land acknowledgement from the syllabus and to institute a second section. Then the university did nothing else. And indeed, in terms of taking those actions, the university made clear and offered to him opportunities to express his views elsewhere. And nothing happened from there until basically the end of February, beginning of March. Because what happened was... I mean, there's an irony to this case a little bit, that you're asking him not to put something on a particular syllabus, but nonetheless are allowing him to voice the view in all kinds of other forums. So it seems if the view is what's causing offense, maybe he is a professor who causes offense in other ways as well. It seems the record might indicate that. What is the point of kind of stopping one aspect of this, but then having him be able to go out and promote the same view all over the place? Because the university, Your Honor, was faced with an enormous disruption. And so what it did was it took action simply to make clear to those people who were offended that the university was not sponsoring or endorsing this opinion. And they did it in a very limited way. Perhaps my memory is incorrect on this, but I thought that several senior officials in the department or the whatever section was visited with Professor Regis, asked him to take this down, told him that if he didn't do that, that there would be consequences. Isn't that correct? That happened later, Your Honor. Basically what happened was after the land acknowledgement was removed from the syllabus and the second section was instituted, nothing else happened for the next two months. Basically because the university was in the mode of assuring its students that they had a welcoming academic environment. Then in late February of 2022, because he was disappointed that the university wasn't punishing him more and he wasn't getting more attention, Professor Regis emailed a listserv for the diversity inclusion section and indicated that he planned on including the land acknowledgement statement again on his spring syllabus. What happened then was the university's union that represents teaching assistants, they filed a complaint. They sent an email indicating that they believed that Professor Regis's actions violated EO 31 and the collective bargaining agreement that the university had entered into with that union. That action then triggered an investigation because when such a complaint is received, under the faculty code, the university is required to take certain steps. And one of the steps is to go out and have a discussion with the professor to see if the university and the professor can come to some sort of understanding or resolution. Can I just interrupt for this? I don't know where this fits in the timeline. If I understand correctly, there was also a request that as many students as possible could file complaints as well. Isn't that correct? No, your honor, that's not. Basically what happened was when the issue first came up, because there had been so many complaints, Director Balazinska wrote an email to the students basically indicating that the university did not support the views that were expressed on the land acknowledgement, but assured them that in the university's views, they would be treated with fairness in Professor Regis's class. And then it said, if you find that you are not treated fairly, here are ways that you can file complaints. It was not an encouragement to file complaints. It was an assurance that in the university's view, they would be treated fairly. And if they weren't, there were avenues for them to make their views known. And how many students took that up? In terms of... How many students made complaints? Well, the summary of complaints was about 11 pages long. It's summarized in the record in the Special Investigatory Committee's report. Basically, once faculty code 2571 is triggered, if there is no resolution reached between the university and the professor, then what happens is the dean is instructed to appoint a three-person panel, a three-professor panel for professors who have nothing to do with the school, the School of Engineering, or with Professor Regis. And they are instructed to go out and do a fact-finding investigation. And that was what happened. And in the course of that, to give you a sense of the disruption that they found, they found that there was, quote, evidence of severe disruption for Professor Regis's students and TAs, Allen School staff, peer mentors and advisors, staff and advisors from other units, and the UW Native community, and that it lasted four weeks. Again, I take that conclusory statement, but how many students did they talk to or who filed complaints? There are hundreds of files, right? I don't know the exact number. And to be fair, many of those complaints were summarized by TAs. So the TAs reported multiple situations where they were having to address this with students. What they found was, again, lasting harm to the UW's reputation as a supportive space for Native people and harm to UW's ability to recruit and retain Native students in STEM. They found significant workload escalation. They made that determination as what, experts or what the students said, or how did that come about? They conducted a months-long investigation, talked to the students who had made complaints, talked to the TAs who had dealt with those complaints, talked to the various different people in the administration who had to deal with things like that, talked to the individuals who are responsible for Native American belonging and care in the university. But here's what we've said. This is from what we've said back in 1975. The desire to maintain a sedate academic environment to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint is not an interest sufficiently compelling to justify limitations on a teacher's freedom to express himself on political issues. So how is your position consistent with that? Well, I think that that case is pre-Pickering. And so we're dealing now in a Pickering balancing situation. And I do agree with you in the sense that the interest has to be strong. But again, this court also has other significant cases that make clear that some form of limitation is actually permissible depending on how it's enacted. And I'll give you an example. For example, well, I will... Well, you see where the line of questioning is going. And I think it's kind of the central issue in this case, which is when are we going to allow a university to discipline a faculty member for something he said in the context of an academic setting? Well, I think that, again, each case is going to have to be addressed instance by instance. And in this instance, remember, there was no punishment meted out. And so that's a critical part of this. There was no silencing and there was no punishing. But I don't really see you taking... I didn't see you arguing there was no adverse action in response to this. You have other arguments, but I didn't see you contending that sort of nothing had happened to him that would meet that element of the showing. Well, in terms of the restrictions on speech, it was very, very narrow. It's hard to imagine a narrower restriction on speech than literally just taking it off a syllabus while offering numerous opportunities for the professor to express his views. In terms of the actual punishment, no, I believe that we take the position that there really was no adverse action here because the adverse action that was alleged, that is alleged, is taking the land acknowledgement statement off the syllabus. That's not punishment. That's a restriction on speech. So we'll set that to this. But counsel, here you got a professor that had a big class and about a third of them got moved into a new class. That's kind of a put down. He also apparently had a merit pay that was deferred. I gather the university doesn't dispute that. So there were consequences. Now, I understand you don't view them as being very significant, but in the context of you have a contrarian professor, which theoretically in the old days was the quintessential nature of a university, you say that's not a problem and that there's no speech control here. Is that right? Correct, your honor. Again, the university, literally in the first request to Professor Regis to take the land acknowledgement statement off the syllabus, Director Balazinska expressly stated that Professor Regis was, quote, welcome to voice your opinion and opposition to land acknowledgements as you have in the past in other settings. Literally in the email where she told him that the land acknowledgement statement had been taken off the syllabus, she said it goes without saying, you have the right to have discussions about land acknowledgements. The record makes clear. I mean, including with students? Including the students. Right, so which way does this cut? Because it seems to me, we don't usually say, well, you can put out your message on the radio, but not the TV. And so that's fine. Oh, no, I think that this cuts strongly in the pickering balance. This weighs heavily on the university's favor. Because again, you need to look at the level of restriction on speech versus the punishment at issue. It's a balancing test. But consider the Native American issue, for example. Here you have a professor that is on the other syllabus, on his signatures and so on. This would be well known. Says exactly the thing that the university took down on the electronic syllabus. Why wouldn't that undercut the feelings of Native Americans as much as putting it on his own syllabus? Well, it may. But the goal of the university, it may undercut his credibility. But again, remember... I don't mean his credibility. I'm saying you've indicated that it was a very strong desire of the university, very understandable that you want to foster Native American enrollment. So take this off. You're saying this offends people. But if they know about other syllabus and about the signature line and all the other places where he said this, he's still a professor. How do you gain anything by just taking it off of one syllabus? And why isn't that really an attempt to riddle his speech? Because when you look at many of the concerns and the complaints that were raised by students, the inclusion of the statement on the syllabus was taken as an endorsement of the notion by the school. One of the reasons why it wasn't taken off later was because when the university had to spend all of this time, number one, taking it off, making it clear that this was not the university's position, doing outreach to students to make clear that that they were in a safe community. That's why when he included it again, it wasn't taken down because the university had taken action to minimize any disruption from that. And so this was not hard to see how anybody would interpret this as anything other than his views. He says, I acknowledge and to your point, the university countered his speech with its own speech. So I'm not sure why anyone would have interpreted this as somehow the university endorsing it. It seems everybody would have understood the university very much did not endorse it. Well, simply, Your Honor, because it is a university document. It's a document that the university instructs the professors to put on it. And whether or not you would have interpreted that way, the complaints and the concerns that were expressed by student tied it directly to the inclusion on the syllabus. And again, this is the balance. I would submit that in terms of if you wanted to teach a class to college administrators in how to deal with things like this and how to reach that balance, this is a situation where the university found the perfect balance because they took minimal action to make clear that the university does not endorse this. They did outreach to make sure that the native students understood that the university supported them. All the while allowing Professor Regis to express his views, which many people continue to find uncomfortable or disagree with. But he wasn't silenced. Right. But I mean, if Professor Regis next semester expresses these views to a class and the same degree of disruption occurs, wouldn't your position require the rule that he couldn't say that statement in class? I think that, Your Honor, that would be it. That would be a different case and a new situation. I think that it's unlikely in this instance because this issue has gotten enough attention and the university has done its work to prevent that from happening. But all you can look at are the facts as they have unfolded so far. And the facts as they have unfolded so far is basically demonstrate that the university took every opportunity and every possibility to prevent him from being silenced while also making clear that the university did not endorse this view. And, Your Honor, just a couple of in terms of I'd like you to consider the court's decision in Barone versus City of Springfield. And this was one that was not mentioned in the briefs. And quite frankly, I came to it when I found out who the panel was because it's a decision that Judge Smith offered. In that case, the plaintiff was a victim's rights advocate. And she criticized the police department. And so she was put on suspension. When she was brought back, she was asked to sign an agreement where she would not criticize the police department anymore. And she refused to sign it. And she was fired. And the decision made clear that such a blanket prohibition on the plaintiff's speech was not justified because it literally silenced her. And the punishment that accompanied the ban was to be fired. But while striking down the prohibition on speech, the decision notes that, and I'm going to quote now, concerns about potentially disruptive speech may justify a narrower restriction on speech. But paragraph 5G's sweeping restriction goes well beyond a permissible restraint under Pickering. And that case cites Dibble versus Chandler. And that's important because their argument has been made about a heckler's veto. And the decision in Dibble versus City of Chandler, which is 515 F3rd 918, takes that issue on directly because that involved a police officer who had put out content on an adult website. And the argument was that by allowing the offense that the community had over that content amounted to allowing a heckler's veto. And the decision goes on and it says, we are not gallied by the Dibble's claim that Ronald Dibble is being subjected to some kind of heckler's veto. Worries about a heckler's veto have generally dealt with the restriction of a citizen's speech based on the anticipated disorderly reaction by members of the audience. So restrictions on a citizen's speech. Those worries do not directly relate to the wholly separate area of employee activity that affect the public's view of a governmental agency in a negative fashion and thereby affect the agency's mission. Right. I mean, I guess this gets to the question of are all government employers treated the same under Pickering? Right. Maybe a university the analysis might look a little different. And it does look a little bit different, but there is an ongoing open constitutional question about the balance between Garcetti and Demers. And I would point you to a decision that was issued just 10 days ago. This is out of the Seventh Circuit. And it's actually it's a little unusual because it was on a petition for rehearing en banc and rehearing en banc was denied. And Judge Easterbrook took the unusual position of issuing a statement along with the denial of en banc hearing. And he quotes in this Sweezy versus New Hampshire, which is a case that has been addressed by the parties in this. And he quotes Sweezy. He says, It is the business of a university to provide that atmosphere, which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail the four essential freedoms of a university to determine for itself the academic grounds to determine for itself on academic grounds, who may teach, what may be taught, how it shall be taught and who may be admitted to study. And he then goes on and this is Easterbrook now says, Sweezy introduced the idea of academic freedom to the pages of the United States reports. Although a majority did not state clearly who possesses that freedom, the views of Justice Frankfurter and Harlan writing in concurrence have persuaded many other federal judges that the university itself is entitled to freedom from control, from outside control, even if a faculty member seeks to enlist the aid of non-academic governmental actors. A university's ability to evaluate and respond to faculty members speech is essential to the educational enterprise. An evaluation of every teacher's speech is essential, is an essential part of academic administration and deans rather than jurors should resolve disputes about those matters. So this is an open constitutional question. We've obviously briefed the Demers issue. What I would say is this, the difference that I think you all are getting at is why is there a difference between the syllabus and the other statements that he's made? And the difference there in this particular instance was it was the views of the administration that the best way to deal with this was to take the minimal action of removing the syllabus to signal that this was not endorsed by the university while still permitting Professor Regis to express his views and also doing outreach to make sure that Native students and other people who were affected were welcomed. We let you go a little over your time and need to be mindful of that. I want to see if my colleagues have any further questions for you. Okay, thank you very much. I'd like to start with my friends on the other side spending a lot of time talking about the severity of the university's actions, claiming that they didn't silence, because he's been allowed to during the pendency of the litigation, continue using his land acknowledgement statement. What the university did isn't actually that bad here. And I think that goes much more towards the adverse action element of a retaliation claim than it does the pickering balance and whether or not the speech is protected in the first instance. In the pickering balance, we look at the public employee's interest balanced against the government interest. And the nature of the strength of the government's response really goes more towards adverse action. And as you noted during my colleague's time, adverse action wasn't discussed at the district court. It wasn't really argued by the other side. But even still, it is met in this case. It's an objective standard in the Ninth Circuit. It's whether the government's actions would chill a reasonable person. And things like an unwarranted disciplinary investigation or a threat of disciplinary action, both of which happened here, can be adverse employment action. And that comes from this case or this court's case in Koselzer. So what class was this? I'm sorry? I'm not sure I saw it on the record. What class was this? It's a coding class? It was a computer science, introductory computer science course. Yeah. So, Judge Thomas, you asked, you know, how much disruption would be necessary. I, you know, I note that whatever it is, we don't have it here. Everything that the university relies on is reaction to Professor Regis's viewpoint. It's, you know, students and staff who have felt offended. And those, you know, those are their feelings, but that's all it is. And offense cannot be disruption, especially in the university content or context. And the university's reaction to that, you know, what they call a massive disruption is still a viewpoint-based action. Government, you know, speech burden on audience react, based on audience reactions is just government hostility in a different guise. No, but I think that if I understand the university's argument is that they are trying to reach out to native students and STEM to encourage them to pursue, you know, STEM-related education. And so if I understand, I'm not endorsing their argument. I'm just saying, so as I understand it, what they're saying is don't put it on the syllabus because we are trying to encourage natives. And if the disruption is the native students don't participate in STEM or drop out, that's a disruption. So what's your response? If the university wants to provide other outreach, like they say that they did to help encourage that, that's in their interest, but they can't do it by burdening the protected expression of one of its faculty. Do you think that if he had put on women can't code as part of his syllabus, that that would be disruptive? If he had included a link to his article, I don't think it would have been disruptive. I think it's still speech. Do you think that's protected? I think it is. It's still speech. Even though women are going to take, have to take introduction. They would. And if they're, you know, they would click through to the article and they would read his viewpoint. But that, and I think it's important to note that his, you know, his administrators had no reason to believe that Professor Regis would actually discriminate or retaliate against anybody. They didn't have those concerns themselves. No, they were concerned the students. And so they could, they could reach out to students and say, hey, Professor Regis, he's not going to discriminate against anybody. He's, you know, he's got these opinions. We don't agree with them, but we can assure you he's going to be treated fairly. And about that Balazinska email, I would note that, yes, they provided that avenue for students to submit complaints. And they take umbrage with the fact that, you know, we think that they were encouraging complaints. But behind the scenes, Professor Balazinska was emailing with other colleagues and said that getting additional complaints would help them take action against Professor Regis. So it's impossible not to view the email of the students and her email with other faculty separate from one another when, you know, looking into what the government's actions. I'm going to ask you to wrap up here since you've exceeded your time. Why don't you make a brief concluding remark? Yeah, I'd just like to know one more time, or, you know, one last time. If this court is interested in remanding for further considerations, I would just request that you do so with instructions to consider the university a special place in our constitutional tradition. And thank you for your time. Thank you. Okay. Regis cases.
judges: THOMAS, SMITH, BRESS